## Garman *versus* Cooper & Co.

1. That a sale of chattels may be good against the creditors, they must either pass to the vendee, or the vendor must pass away from them, leaving them in the exclusive possession of the vendee.

2. The transfer must be actual, continuing and exclusive in the vendee.

3. If the delivery of possession be but temporary and followed by a return to the vendor, the sale is colorable and fraudulent.

4. The facts in this case not sufficient to submit to the jury the question of delivery of possession.

May 15th 1872.   Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Franklin county* : No. 72, to May Term 1872.

This was a feigned issue under the Sheriffs' Interpleader Act, framed July 17th 1871, between G. C. Cooper & Co., plaintiffs, and John Garman, defendant.

John Garman, the defendant, had recovered a judgment against Moses Anderson for $1363.60 ; he issued execution on his judgment and under it the sheriff levied on a portable steam saw-mill, &c., as the property of Anderson ; Cooper & Co. claimed the property as purchasers from Anderson, and having given notice to the sheriff of their claim, on his application this issue was framed.

About the 1st of October 1869, Anderson bought a portable "saw-mill complete" from Cooper & Co., who resided in Mount Vernon, Ohio, for $2515, and paid $400 on the contract; for the remainder he and his brother Timothy Anderson gave three notes, dated October 15th 1869, and payable in four, eight and twelve months.   The mill was put up on land bought by him from William McClelland; he ran it about a year.   Being urged by Cooper & Co. for the payment of his notes, on the 24th of October 1870, he resold the mill, &c., to them, through their agent D. L. Travis, by contract in writing, reciting his indebtedness to them on the three notes to be $1971.44,. including interest, "for an engine, boiler and saw-mill ;" and agreed " to deliver the same to them at my expense, on lands of Frank Reese, near the Cove road, within about a mile from where I have been running it, said D. L. Travis, agent of said Messrs. C. G. Cooper, agreeing to give me the priviledge of repurchasing the said engine, boiler and saw-mill, complete, until the 1st day of April next, for the same amount for which I have sold to him for Messrs. C. G. Cooper & Co." Besides the writing it was agreed that Cooper & Co., should have time till Travis should go home and report to them ; he then reported to Anderson, December 16th 1870, and the plaintiffs sent him the notes by mail marked paid.   Anderson began the delivery of the mill on Reese's land the next day after the sale.   Travis was then on Reese's land and superintended the delivery, it took two days or more ; it was delivered to Travis for the plaintiffs, it was put up

[Garman v. Cooper.]

on Reese's land under the superintendence of Travis; Anderson settled with the men who assisted in putting the mill, &c., up. Anderson owed Travis $30; he paid to the men $23 and to Travis $7, the balance of his debt. At the time of the removal of the mill to Reese's land, Anderson had a right there; the timber was almost exhausted on the McLelland tract.

Anderson on the trial testified, that after the mill was up on Reese's land, Travis went to Somerset county, authorizing witness to work the mill till his return; Travis returned about December 16th, and witness rented the mill from him till 1st of April then next for $100, which he paid in advance. The unpaid notes were the whole consideration paid to witness for the mill. He sold to Cooper & Co. to pay the debt and keep the property from being sacrificed; the mill was moved because timber was more plenty on the Reese land; Cooper & Co. had no right on the Reese land; Travis was there about a day after the mill was put up, and then went away. Witness ran it as before, employed hands and paid them; Travis did nothing afterward in superintending; witness sold and cut timber.

Travis testified, that he had been sent by Cooper & Co. to collect their debt from Anderson, that he insisted on payment, that Anderson said he could not pay money, and as the best thing witness could do, he took the mill, &c., back in payment of the notes; that Reese allowed him to put the mill on the ground, and after consultation with Cooper & Co., they ratified the arrangement which he had made.

Both Anderson and Travis testified that the sale had been made in good faith to pay Cooper & Co., and not for the purpose of defrauding Anderson's creditors. Anderson was very much in debt at the time, but believed that he was solvent.

The defendants gave evidence by a number of witnesses, that Anderson had used the mill as before the sale, had cut and sawed timber and sold it; paid laborers; that he was insolvent and afterward made an assignment for the benefit of his creditors.

The plaintiffs' points which were affirmed were:—

1. "If the jury believe, from the evidence, that Moses Anderson sold, and the agent of the plaintiffs purchased the engine, boiler and saw-mill complete, for the consideration of the notes of $1971.44 held against Anderson by plaintiffs, which were receipted and given to him, and that the said property was delivered into the possession of Travis, the agent, on the land of Reese, with a bonâ fide intention of changing the possession as well as the title to the property, then the sale and purchase were valid, not only as between the parties, but as between them and creditors, notwithstanding the saw-mill was leased by the agent to Anderson from about the middle of December 1870 to 1st of April 1871.

2. "The change of the possession of personal property must be

22 P. F. SMITH—3

[Garman *v.* Cooper.]

governed by the nature and kind of property sold, and whenever such change is made as the property is reasonably capable of, the requirements of the law are filled, as this was a cumbrous piece of machinery, weighing 18,000 pounds, which was required to be fastened to the earth as a part of the freehold. If therefore Travis, the agent, took the possession of the saw-mill and fixtures, and had it re-erected on the land of Reese, at the expense of the company, and for the company, the title was complete in the company, and the fact that he leased the saw-mill from December to April, did not divest the company's title.

3. "The real questions in the case are, did the agent of the company make an honest purchase of this machinery from Anderson for a valuable consideration; did he receive actual and exclusive possession of it for his employers; if so, then the contract is valid, and the mere fact that the agent employed Anderson and his hands to aid in the work of re-erection, and that he leased to . Anderson for a few months, does not make the sale void, and the plaintiff must have the verdict."

The defendant's third point was :—

"If the jury believe from the evidence that Mr. Travis, as agent of Cooper & Co., only superintended the removal of the steam saw-mill from the place where it was on the day of the alleged sale, and its erection on the land of Mr. Reese, and then went away, leaving Anderson in exclusive possession and control of the mill and the business conducted thereat; and that Anderson afterwards employed and paid the hands, retained possession of the mill and conducted its business, as the ostensible owner thereof, and treated it in all respects as he had done before the alleged sale; then there was not such a change of possession accompanying and following the alleged sale as the law requires, and the verdict must be for the defendant."

To this the court (Rowe, J.) answered : "This point is not affirmed; it is based on too narrow a view of the facts."

The court, after recapitulating the facts, and stating the law as to fraud, said :—

* * * "The jury are then to consider :

"1. Whether the resale by Anderson to the Coopers of the mill and machinery bought from them, was honest and fair, what it purported to be, and not a mere cover or sham intended to hide the property from the other creditors, and prevent them from recovering their just debts. If it was not fair and honest, but a mere cover, it was void for actual fraud, and the verdict ought to be for the defendant, the execution-creditor.

"But the jury must understand that a man may take the property of his debtor for a just debt, though he knew that there are other creditors. To make fraud the intention must be to *prevent others* from recovering their just debts. Where the object is sim-

[Garman *v.* Cooper.]

ply to save one's own debt, the transfer is not fraudulent, though the effect is to withdraw the property from other creditors.

" [The evidence in this case to show actual fraud, to show either a design to cheat or to hinder other creditors, is as we view it meagre, but whether it is sufficient is for you.] You may find from all the facts in proof that the sale was a mere cover, not what it purported to be, and that the property was really to be Anderson's, as to himself and the Coopers, and not his only as to other creditors. * * *

" If the jury shall determine that there was no actual fraud in this resale, they will then have to consider the further question, Was there legal fraud ?

" There was no legal fraud if the property was delivered to the plaintiffs here, or to their agent Travis, in pursuance of the resale, and the possession of it retained by them in such manner as to give notice to the world of the change of ownership. Delivery must accompany and follow the sale to render it valid. There must be a bonâ fide substantial change of possession, which must continue. Travis must have assumed such control of the mill as reasonably to indicate to all concerned the fact of the change of ownership.

" [There is evidence of such assumption of control by him, and it is therefore for the jury to say, whether it was bonâ fide and enough to give notice to the world. Did the vendee do all that he might be expected to do in the case of a real and honest sale ?] * * *

" It is true that the possession taken by the vendee must be exclusive of the vendor. A concurrent possession will not do. And the possession must continue in the vendee and not go back after a brief interval to the vendor.

" [But the assistance given by Anderson and his hands in the conveyance of the mill over to Reese's land, would not be a colorable concurrent possession.

" If the evidence of Anderson and Travis is believed, the plaintiff's agent would seem to have had the exclusive control and possession of the saw-mill from the time of the sale until it was set up and in running order on the Reese land, and for a day perhaps thereafter.]

" Then the agent went away for three or four weeks, leaving Anderson to work the mill as before. He declined to rent to Anderson until he could consult with his principals, but gave him permission to run the mill in the meantime, and Anderson ran it as before, employing and paying the hands, and cutting and selling timber. Upon his return, the agent rented the mill to Anderson for $100, paid in advance, until 1st of April following. Under this bailment or renting, Anderson was holding the mill and run-

[Garman *v.* Cooper.]

ning it when the execution of the defendant in this issue came upon him, and the mill was seized as his property thereunder.

" Now if the mill had remained on the old site, on the McLellan tract, owned by Anderson himself, and the same state of facts had existed as has been shown here, with respect to the mill on the Reese land, the transaction would be colorable and fraudulent. [But upon the sale, the mill was taken up bodily and conveyed away to the Reese tract, some distance off, though it was a huge affair, and this removal took place under the direction of the plaintiff's agent, Travis, who consulted Reese, if he is believed, about placing it on his land. This was a notorious act, this removal, though it was to a tract on which Anderson had a timber leave.

" Would the bailment of the mill to Anderson, after such removal, and supposing the agent Travis to have had exclusive control and possession of the mill, during the time of its removal, that is from the time of sale to the contract of bailment, would such bailment render the whole transaction colorable and fraudulent? We think not, if there was enough in the circumstances attending the delivery of the property to Travis, and in the way he held it afterwards until the bailment, to give notice to the world of the change of ownership; and so we instruct you.] * * *

" [On the whole then, gentlemen, if the resale was honest and fair, and the delivery of the mill to the plaintiffs, and the possession held by them of it afterwards, of such a character as to give notice to the world of the change of ownership, notwithstanding the bailment to Anderson, whereby the property went back to his control after a brief interval, your verdict ought to be for plaintiffs;] otherwise you should find for the defendant."

The verdict was for the plaintiffs.

The defendant removed the record to the Supreme Court; and there assigned for error the answers to the points and the parts of the charge in brackets.

*J. W. McD. Sharpe* (with whom was *W. U. Brewer*) for plaintiffs in error.

There was no argument, oral or printed, for defendants in error.

The opinion of the court was delivered, October 17th 1872, by

THOMPSON, C. J.—The principal question in the court below was whether the testimony presented a case of competent delivery of the property sold and accompanying possession, or a case of retained possession by the vendor. If the latter, the transaction as a sale was fraudulent as against the creditors of the vendor, notwithstanding no actual fraud was intended by the parties. This is elementary law in the Commonwealth, and cases need not be cited to prove the principle.

[Garman *v.* Cooper.]

Anderson, the defendant in Garman's execution, bought the portable saw-mill, the property in question, originally from Cooper & Co., and set it up on lands of one McLellan, on which he had a timber leave, and operated it for about a year and then resold it to Cooper & Co., in consideration of the unpaid purchase-money due them. This resale was in writing, and contained a stipulation in favor of Anderson, by which he had the option to repurchase the mill, on or before the first of April ensuing the date of the contract, which was on October 24th 1870, on payment of the amount of unpaid purchase-money for which he had sold it back to Cooper & Co. The contract was made with one Travis, who represented the Coopers as agent. By the contract, Anderson was to remove the mill from the McLellan place, to a distance of about a mile, and set it up on Reese's land, on which also he had a timber right, at his own expense. This he did, Travis assisting, and set it up and delivered possession, he says, to Travis. Doubtless he did, but Travis remained in possession at most but a day or part of a day, and left the mill in Anderson's possession and on his ground for the time being. About a month, or a little over, Travis returned and leased the use of the mill to Anderson, until the ensuing 1st of April, for $100. The mill, therefore, remained in Anderson's possession and occupancy, on his own ground, by right of his wood leave, as it had done before the sale to Cooper & Co., until it was levied on by the sheriff on Garman's execution on the 18th July 1871, as his property. There was no contrariety of testimony as to these facts, and we think the law was clear as to what should have been the charge of the court upon them.

The mill was portable, and intended to be changed from place to place to suit the convenience of timber. It was personal property beyond a doubt, and so treated in the contract between Cooper & Co. and Anderson, for it was agreed to be delivered by the latter to the former, and it is claimed was so delivered. That it was removed from one place to another, as agreed, is not disputed. The testimony all shows this, but was there such a delivery with accompanying possession to the buyers as the law requires to indicate a change of property? It is but a change in the mode of stating the elementary rule already referred to, to say, that on the sale of goods and chattels they must either pass out of the seller to the buyer, or the seller must pass away from them; leaving them in the exclusive possession of the buyer. The transfer must be actual, continuing and exclusive in him. In all cases where the delivery of possession has been but temporary, and followed by a return to the seller, the law regards it as colorable and fraudulent in law. This is well illustrated in Young *v.* McClure, 2 W. & S. 147. There, there was a bargain concluded for a sale of a yoke of oxen, and the cattle were delivered into the possession of the vendee, who drove them to a blacksmith shop to be shod, and

[Garman *v.* Cooper.]

then, on the terms of a loan, returned them to the vendor. They were, while in his possession, levied on as his property and sold. In the contest which arose between the claimant and the execution-creditor, and which eventually came to this court, Sergeant, J., in laying down the law of the case, said: "There must be not only a delivery of the thing at the time of transfer, but a continuing possession, and that must be shown by the claimant;" and further in the same opinion he says, "if such a transaction as this is allowed it would be very easy to concoct schemes for defeating creditors, and yet allow the assignor to keep possession. * * * The question in these cases, however, is not whether under all the circumstances the transfer is in good faith, and without design to cover the property, or to delay or hinder creditors; it is an inflexible rule which makes it a fraud *per se* if the possession does not follow, as well as accompany the transfer." This is a rule of universal application in this state, as the authorities cited abundantly show.

We are, therefore, of opinion that the learned judge erred in not charging as requested in the defendant's third point, which was in exact accordance with the views here expressed, instead of leaving it as a question of fact to the jury to say, whether there was a delivery of possession of "such a character as to give notice to the world of the change of ownership, notwithstanding the bailment to Anderson, whereby the property went back to his *control after a brief interval.*" This idea pervades the charge, and is found in the answers of the learned judge to the plaintiff's first, second and third points, as well as in the refusal to affirm the defendant's third point. This instruction, as the testimony stood in effect, abrogated the rule of law in cases of temporary changes of possession of personal property when sold, and substituting therefor the uncertain conclusions of the jury on the point, of what should be a sufficient delivery to indicate a change of possession of property capable of actual manual change of possession; and this too, to be controlled by their belief in the honesty of the parties. Fraud *per se* in a transaction would not exist under this administration of the law. We think, therefore, that the assignments of error, viz., the first, second, third, fourth, eighth and ninth errors are sustained, and that the judgment must be reversed and a new trial awarded.

AGNEW, J.—I doubt whether the facts were not sufficient to carry the question of possession to the jury.